IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHEPARD JOHNSON,

      Plaintiff,                No.  2:10-cv-1968 GEB GGH PS

      vs.

CHESTER MITCHELL, et al.,

      Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

*Introduction and Summary*

      Real estate law can be complex indeed even when applicable in familiar environs. Add to this complexity that the locus of the dispute herein originated with real estate on an "island paradise" development in Panama, and it is no wonder that the parties are at such loggerheads.  Either defendants are persons who saw their island paradise home dreams disappear through the acts of what may be likened to a Ponzi scheme orchestrated by plaintiff Shepard Johnson, or plaintiff was victimized by impatient, unrealistic real estate investors who ultimately sought to have plaintiff criminally convicted for nothing more than reasonable delays in the completion of development infrastructure and conveyance of title to paid-for-properties.

      Although the court will not finally decide here which of the above two scenarios is true, for the reasons given herein, defendants' summary judgment motion on plaintiff's

1    malicious prosecution claim should be granted on the "favorable termination issue," but should

2    be denied on the "probable cause" issue.  However, because judgment on one issue was all that

3    was required for complete judgment, judgment should be entered on behalf of all defendants in

4    this action.  Plaintiff's counter-motion for summary judgment should be denied.

5    *Factual Setting*

6            Plaintiff Johnson and corporate entities created by him (Groupo Islas Tropicales

7    (GIT) and Groupo Cayo Nancy S.A. (GCN)) were able to acquire, for purposes of real estate

8    development, a substantial real estate holding on the Island of Solarte within the country of

9    Panama (Finca 302 and Finca 5409 within 302[1]). Johnson developed and activated a plan where

10   investors would acquire lots within the larger development.  While some of the actual investors

11   (defendants herein) were to acquire lots within the to-be-developed real estate holdings in what

12   we understand in this country as fee title, or close to it, others were only able to purchase "rights

13   of possession," (ROP) much like a long-term leasehold or license.  The original contracts for the

14   most part did provide that the appropriate title under Panamanian law would be conveyed to the

15   purchasers upon complete payment of the lot purchase price.  Also promised were infrastructure

16   improvements, although the precise improvements and when they would be completed are

17   disputed by the parties.

18           Years went by and neither the appropriate titles were conveyed, nor were the

19   infrastructure improvements completely, or perhaps even minimally, realized according to the

20   investor defendants herein.  Some of the investors grew to be angry with Johnson, accusing him

21   of a Ponzi scheme type action in which the monies derived from the purchase of lots, which were

22   to be earmarked for improvements, were diverted to Johnson's personal use in California.  Also,

23   the investors' conveyance of titles became enmeshed in further Johnson imposed CC&R

24   requirements and modified contracts.  Indeed, those investors who had bargained for "rights of

25

26   _____

     [1] "Finca" appears to be a term for a large plot of property.

2

possession" were given assertedly worthless non-voting or very diluted "preferred" shares in one of Johnson's corporations which held the rights to develop the property.  The investors' accusations seem reminiscent of the proverbial carrot on a stick being dangled in front of the hard working cart mule.

Johnson, on the other hand, asserts that his plans of conveyance of titles and completion of the infrastructure were bedeviled by a cumbersome, if not corrupt, Panamanian bureaucracy – problems of which had been communicated to the investors and of which they were well aware from the outset.  Environmental concerns also impeded progress.  The investors, he claimed, were unrealistic and impatient in terms of their expectations of immediate problem resolution.

After abortive resolution attempts between Johnson and the defendants herein, in which each side accused the other of dishonoring, the defendants herein acquired Panamanian counsel who advised them to file complaints ("denuncios") which alleged criminal fraud on the part of Johnson. The precise history of these criminal complaints are detailed *infra*, but suffice it to say that these criminal complaints, which had been initially adopted by local Panamanian prosecutors, were later "provisionally" dismissed by Panamanian courts.  The reasons for dismissal, and especially whether the dismissals were related to the merits of the accusations, are issues to be resolved herein.

Johnson, whose personal stake in the development succumbed to bankruptcy, filed a number of lawsuits, including the instant federal litigation, alleging malicious prosecution as a result of the criminal prosecution.  He also filed state court actions alleging defamation.  Whether Johnson has alleged defamation in *this* lawsuit is an issue which the undersigned will discuss *infra*.

After numerous motions in this case resolving subject matter (diversity) and personal jurisdiction for some named defendants, the remaining defendants brought summary judgment motions arguing that Panama, whose law controlled herein, did not recognize a claim

3

1  for malicious prosecution.  In the alternative, even if California law applied, Johnson could not

2  satisfy the requirements for a malicious prosecution action as a matter of law.  Defendants also

3  argue that the Panamanian criminal proceedings were never dismissed on the merits.  Belatedly

4  raised in the reply is defendant's contention that Johnson's malicious prosecution claim is barred

5  by the Panamanian statute of limitations.  Johnson brought a counter-motion for summary

6  judgment, which when read in its entirety is simply not an affirmative request for judgment, but

7  rather is an opposition to entry of any judgment for defendants.

8  *Remaining Defendants In This Action and Status of Other Defendants*

9            The remaining defendants in this action who move for summary judgment are:

10  The Miner Defendants – David and Sarah – fee title purchasers in 1999

11  The Mitchell Defendants – Chester and Catherine – ROP purchasers in 2002

12  Sondra Tornga – ROP purchaser in 1998

13  Anne-Michelle Wand – purchaser of two lots – type of purchase unclear for October 1998

14            purchase, but ROP for the July 1998 lot

15  Viki Kiman – fee title and ROP purchaser in 2003

16  Todd Johnson – fee title purchaser in 2002

17  The Shargorodsky Defendants – Efim and Elena – ROP purchasers in 2003

18            All other previously named defendants in this action have been dismissed, or are

19  pending dismissal, or for some other reason have not participated in this litigation.  Those non-

20  moving (summary judgment) defendants whose status remains pending are:

21  Arosemena – F & Rs recommending dismissal for lack of personal jurisdiction;

22  Berrocal – F & Rs recommending dismissal for lack of personal jurisdiction;

23  Solarte Inn Corp – F & Rs pending for lack of service;

24  Reinhold – declaration regarding service filed (Dkt 241) – no response by this defendant;

25  Kahler – served; responded that she cannot afford an attorney and asks for leniency (Dkt. 244);

26  Lynch – did not respond to the undersigned's order to show cause.

The court is faced with the problem of what to do with the two defendants who have not responded (Reinhold), or not responded to the to the court's orders (Lynch answered the Second Amended Complaint, Dkt. 117, but apparently is living in Panama City), or has simply pled for leniency (Kahler).  Reasons exist to have them adjudged as the moving defendants because the rationale of judgment herein would apply equally to any claim for malicious prosecution brought by Johnson.  See Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 742-43 (9th Cir. 2008).  On the other hand, parties who seemingly, wilfully do not participate, even when told to do so, do not deserve a windfall judgment in their favor.

In light of the large expenditure of court resources to adjudicate this case thus far, the undersigned believes that the court's discretion should be exercised to have this case entirely closed.  Cases need to be resolved, and it does not appear to the undersigned that a miscarriage of justice will occur if the non-responding defendants are lumped in with the moving defendants.

*Issues*

1.  Whether defendants' motion is one for partial or complete summary judgment, i.e., has Plaintiff Johnson set forth a claim for defamation;

2.  Whether defendants may belatedly raise in this motion a defense based on the statute of limitations;

3.  Whether Panamanian or California law applies in respect to a claim for malicious prosecution;

4.  Whether the criminal proceedings in Panama were determined on the merits in favor of Johnson.

5.  Whether defendants had probable cause for causing a criminal prosecution to be initiated.

6. Whether the civil conspiracy claim should be dismissed as well.

/////

/////

1    *Summary Judgment Standards*

2            It will not do to set forth boilerplate law regarding summary judgment in that, as

3    fully discussed herein, the two substantive issues on which judgement is analyzed (favorable

4    termination and probable cause) are questions of law for the court regardless of potential,

5    subsidiary factual controversies.

6            The undersigned has looked in vain for a discussion of summary judgment

7    standards utilizing California law for malicious prosecution (the substantive law to be applied for

8    this case (see below)).  However, there are parallel actions where issues of law are reviewed on

9    summary judgment in federal court[2] – the most analogous being that of qualified immunity.

10           In Peng v Mei Chin Penghu, 335 F.3d 970 (9th Cir. 2003), the allegation involved

11   a lack of probable cause for arrest.  The Ninth Circuit held that where the operative historical

12   facts were not at issue, even if incidental facts were disputed, or the inferences from historical

13   facts could be disputed, summary judgment was appropriate because qualified immunity was

14   ultimately a matter of law for the court.  Id. At 979-80.  The Peng standard will be applied here.

15   Thus, it will not matter if the parties dispute a number of subsidiary facts, e.g., who engaged in

16   pre-Panamanian criminal complaint settlement in good faith, if this fact is not material to the

17   historical, undisputed, or indisputable, facts relied upon by the court.

18   *Discussion*

19           I. Malicious Prosecution Is The Only Claim In This Litigation

20           The Third Amended Complaint (TAC) provides in its caption:

21   THIRD AMENDED COMPLAINT FOR:
     1.MALICIOUS PROSECUTION [as to 8 defendants with a conspiracy claim as to
22   all named defendants]

23   \\\\\

24

25           [2]  Even though California substantive law is to be applied, federal law is controlling for
     procedural issues such as summary judgment standards.  Snead v.Metropolitan Property & Cas.
26   Ins. Co, 237 F.3d 1080, 1093 (9th Cir. 2001).

Page 4 of the TAC sets forth:

> Plaintiff sues for malicious prosecution for defendants....
> Plaintiff sues all defendants for conspiracy to commit malicious prosecution and
> punitive damages.

Starting on page 41 of the TAC, plaintiff alleges express claims for malicious prosecution against each of the eight defendants, and on page 64 alleges the conspiracy to commit malicious prosecution against all defendants.  Plaintiff never alleges a claim (cause of action) for defamation.

Yet plaintiff alleges in various, previous factual paragraphs that he was defamed by plaintiffs herein.  See paragraphs 45, 51-59, 83-110.

Defendants moved in their motion for summary judgment only on the expressly stated claim of malicious prosecution, and plaintiff opposed/moved for summary judgment only on that specific claim.  Although the parties do not raise the issue, due to the presumptive "liberal reading of pro se complaints,"[3] the court must determine whether a latent claim for defamation survives the summary judgment motions.

However, the undersigned finds that plaintiff Johnson herein is not your typical pro se plaintiff – generally, completely unschooled in the law, and perhaps generally under-educated in all respects.  By virtue of the briefs filed in this case, and his court appearances, the undersigned concludes that either plaintiff has had legal training himself, or has a lawyer ghost writer assistant.  At some point fairness to defendants must enter the equation, and the court will not apply a presumption of legal inability in favor of plaintiff when it is not warranted by the facts.

The above discussion leads to the conclusion that the court will not add a defamation or other claim to the *Third* Amended Complaint when plaintiff has so assiduously

---

[3] It is well established that the court must read pro se complaints with an eye towards deciphering any claim that might possibly be stated therein.  See Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 595-96 (1972); Pouncil v. Tilton, 704 F.3d 568, 574-75 (9th Cir. 2012); Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir.1992).

1  refrained from expressly stating one.  Plaintiff has had more than ample opportunity to state an

2  express claim for defamation, yet he has not done so.

3      II. Whether Defendants May Seek to Have the Action Dismissed Based on the

4      Statute of Limitations

5          Nowhere in their motions for summary judgment did defendants seek to have any

6  contention regarding the statute of limitations decided in their favor.  It was not until the

7  defendants' reply brief that such a contention surfaced.  The undersigned will not recognize a

8  contention raised for the first time in the reply brief.  See Tim Ryan Const.v. Burlington Ins.,

9  2013 WL 1774627 *5 (W.D. Wash. (2013) citing Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir.

10  2007).[4]

11      III. Choice of Law – California or Panama

12          It would seem to be an easy question – the real estate in question lies in Panama;

13  the contracts at issue were directed to that real estate; defendants sought the assistance of

14  Panamanian counsel; Panamanian authorities and courts dealt with the accusations of violation of

15  Panama's criminal law; plaintiff claims that there was no probable cause for the accusations and

16  that the Panamanian courts absolved him of any wrongdoing.  But many things in the law are not

17  easy, and for the reasons set forth below, California law shall be applied.

18          In this diversity action, the substantive law of California, which includes the

19  choice of law rules to be applied herein, govern.  While federal jurisdiction provides an

20  alternative forum for the adjudication of state-created rights, it does not carry with it the

21  generation of rules of substantive law.  Gasperini v. Center for Humanities, Inc., 518 U.S. 415,

22  427 (1996).  The law is clear that federal courts sitting in diversity apply state substantive law

23  and federal procedural law, along with that state's choice of law rules.  See e.g., Erie R. Co. v.

---

25      [4] Since defendants in their motion made it clear from the beginning that there might be

26  an issue concerning choice of law, defendants had an obligation to anticipate that Panama law
   might apply, and to brief the consequences of that possibility.

1  Tompkins, 304 U.S. 64, 78 (1938), Gasperini, 518 U.S. at 42, Coufal Abogados v. AT&T, Inc.,

2  223 F.3d 932, 934 (9th Cir. 2000).  Thus, the forum state is free to determine whether a given

3  matter is to be governed by the law of the forum or some other law.  See Klaxon Co. v. Stentor

4  Electric Mfg. Co., 313 U.S. 487, 496-97 (1941).

5          Choice of law questions in California are subject to the "governmental interest
        analysis." [footnote omitted]  Offshore Rental Co. v. Continental Oil Co., 22
6          Cal.3d 157, 148 Cal.Rptr. 867, 869, 583 P.2d 721, 723 (1978) (In Bank). Under
        this approach, the forum court must "search to find the proper law to apply based
7          upon the interests of the litigants in the involved states." Reich v. Purcell, 67
        Cal.2d 551, 63 Cal.Rptr. 31, 33, 432 P.2d 727, 729 (1967) (In Bank). This
8          analysis begins with an examination of the laws of the states involved in the
        action in order to determine whether there is a "true conflict." Denham v. Farmers
9          Ins. Co., 213 Cal.App.3d 1061, 262 Cal.Rptr. 146, 147-48 (1989). As discussed
        above, in this action for malicious prosecution, the New York special injury
10         requirement creates a true conflict.

11         Where there is a "true conflict," California law, the applicable law of the forum,
        requires that the court conduct a "comparative impairment" analysis. Paulo v.
12         Bepex Corp., 792 F.2d 894, 895 (9th Cir.1986). The district court referred to this
        approach, but did not expressly analyze the respective state interests. Under the
13         comparative impairment approach, the court examines "which state's interest
        would be more impaired if its policy were subordinated to the policy of the other
14         state." Denham, 262 Cal.Rptr. at 148. The balancing of impairment is slightly
        weighted by California's general preference for applying its own law. Fleury v.
15         Harper & Row Publishers Inc., 698 F.2d 1022, 1025 (9th Cir.), cert. denied, 464
        U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983).
16

17 Engel v. CBS, 981 F. 2d 1076, 1080-81 (9th Cir 1993).

18 The fact that two states (or a state and a foreign country) are involved does not in itself indicate

19 that there is a choice of law problem.  See Hurtado, 11 Cal.3d 574, 580, 114 Cal.Rptr. 106

20 (1974).  There is obviously no problem where the laws of the two states are identical.  Id.  Thus,

21 if there is not a true conflict, the law of the forum (here California) will be applied.  Love v.

22 Associated Newspapers, Ltd, 611 F.3d 601, 610 (9th Cir. 2010).

23          The initial analysis requires a look at both California and Panama law regarding a

24 claim for malicious prosecution.  The elements of this cause of action in California are: (1)

25 commencement of a criminal, civil or administrative proceeding; (2) its causation or initiation by

26 the defendant in the malicious prosecution action against the plaintiff in the same action, who

1   was a defendant in the original proceeding; (3) the former action's bona fide termination in favor

2   of the present plaintiff; (4) lack of probable cause; (5) malice, and damage to the present plaintiff

3   (former defendant).  Engel, 981 F.2d at 1079.

4          The parties dispute the existence of even a claim for malicious prosecution under

5   Panama law in the first instance.  They initially focus on a provision in Panama law for bad faith

6   "procedural" actions:

7          The Parties will respond for the damages they cause to another or a third party
          with their reckless or bad faith procedural actions, which may be considered

8          temerary or taken in bad faith.  When evidence is found of such behavior, the
          Judge will impose the corresponding sanction in the resolution...

9

10  Article 217, Judicial Code of the Republic of Panama, See Shakik Dec., Dkt 274 Attachment 3 at

11  2; see also Patel Dec. Dkt 263-1, electronic pages 32-33.

12         Plaintiff seeks the application of California law asserting there is no true conflict

13  in the laws of these two jurisdictions (Dkt. 292 at 10-12); defendants contend that Panama law

14  applies.  Each side has filed declarations from Panamanian attorneys regarding the existence of a

15  claim for malicious prosecution under Panamanian law.  Each declarant set forth above comes to

16  the opposite conclusion regarding whether a malicious prosecution claim exists under Panama

17  law, but the declarations are largely *ipse dixit*.  Defendants' declarant Shakik simply opined that

18  no such claim existed.  Plaintiff's declarant Patel, on the other hand, in arriving at the opinion

19  that such a claim was well established, even went so far as to list the elements of a malicious

20  prosecution claim without citation to any authority.  These elements mirror that of California

21  law.  Just looking at the translations of Article 217, the court was under the initial impression that

22  the procedural section applied only to conduct *within* an action.

23         However, at hearing, plaintiff produced a copy of a decision from the high court in

24  Panama purporting to establish that Article 217 actually did authorize a free standing claim for

25  malicious prosecution.  The undersigned tasked the parties with further work concerning this

26  decision, i.e., an authentic translation and expert commentary regarding the case.  Defendants

1   thereupon essentially abandoned any claim that the case did not stand for the proposition

2   advocated by plaintiff.  Dkt 291 (not conceding the existence of such a claim, but not supplying

3   any information regarding the submitted case).[5]

4           Plaintiff, on the other hand (who seems to be able to obtain experts in Panama law

5   at will) supplied a further declaration and commentary on the case.  Patel Dec. # 3, Dkt. 292,

6   Attachment 4, paras. 9-11:

7       10.  In the referred to case [Arias and Cambar v. Rogelio Arias et al., August 12,
        2011], the Supreme Court [of Panama] confirmed the ruling made by the civil
8       circuit court of first instance, which declared that Rogelio Campos Arias had
        caused damages to Adolfo Campos Arias due to the temerary[6] actions taken in
9       bad faith in a criminal proceeding initiated by Rogelio... against Adolfo....

10      11. Adolfo... invoked Article 217 of the Judicial Code of the Republic of Panama
        as the basis of the claim.  The Supreme Court, when examining the norm and
11      confirming the civil circuit court resolution, affirms that Article 217... constitutes
        a substantive right and that relief on the basis of Article 217 can be sought by the
12      parties....

13          At this point, the court will accept plaintiff's position and the now unopposed

14   Patel declaration detailing that a claim for malicious prosecution mirrors that of California.  See

15   Patel Dec. #1, Dkt. 292, Attachment 2 at 3-4 (Patel Declaration 263-1) ("Article 217 of the

16   Judicial Code of the Republic of Panama contains [a] provision that is similar or equivalent to

17   the malicious prosecution law [California] as described above.").[7]

18   /////

19

---

20      [5]  The undersigned is not unsympathetic to defendants' plight wherein they lament the
     cost of litigation, and expressing the fact that they are essentially out of resources to litigate
21   effectively.

22      [6]  Reprehensibly heedless or reckless.

23      [7]  (Para. 9) "The elements that must be proved with respect to the provision as described
     in Article 217 of the Judicial Code of the Republic of Panama are (1) that the reckless or bad
24   faith judicial action has been filed; (2) that the defendant in the judicial action suffers from
     damages; that there exists a causal link between the judicial action and the damage."
25   Further,"reckless in this context means that the person is acting with knowledge that he or she is
     entitled to the right."  Id.  In the absence of opposition, the undersigned finds that these elements
26   encompass California's probable cause, malice and favorable termination elements.

1          Accepting the unopposed declaration interpreting the decision of Panama's

2   highest court, and the declaration describing the elements of a malicious prosecution claim under

3   California and Panamanian law, the undersigned determines that there is no true conflict with

4   California law, and thus California law applies.

5          IV. <u>Termination of the Panama Criminal Proceedings Were Not on the Merits</u>

6          Having determined that the law of California applies to the malicious prosecution

7   claim, the court turns to the substantive law of California regarding malicious prosecution.

8   Determination of whether a prior proceeding was terminated on the merits in favor of plaintiff in

9   the malicious prosecution action is *not* a factual matter, but is one for interpretation of law by the

10  court.

> The element of favorable termination is for the court to decide; thus, our review is
> de novo. (*See Pattiz v. Minye* (1998) 61 Cal.App.4th 822, 826–827, 71
> Cal.Rptr.2d 802.) It calls for a termination reflecting on the merits of the action
> and the plaintiff's innocence of the misconduct alleged. (*Lackner v. LaCroix*
> (1979) 25 Cal.3d 747, 750–751, 159 Cal.Rptr. 693, 602 P.2d 393; *Pattiz v. Minye,
> supra*, 61 Cal.App.4th at pp. 826–827, 71 Cal.Rptr.2d 802.) When the proceeding
> terminates other than on the merits, the court must examine the reasons for
> termination to see if the disposition reflects the opinion of the court or the
> prosecuting party that the action would not succeed. If resolution of the underlying
> action leaves a *residue of doubt* about the plaintiff's innocence or liability, it is not
> a favorable termination sufficient to support a cause of action for malicious
> prosecution. ( *Id.* at p. 827, 71 Cal.Rptr.2d 802.)

18  <u>Sierra Club Foundation v. Graham,</u> 72 Cal.App.4th 1135, 1149 (1999) (emphasis added)

19         There is much residue of doubt that the criminal proceedings were *ultimately and

20  finally* terminated *on the merits in favor of plaintiff herein*.  The criminal proceedings in Panama

21  started out mostly in favor of defendants.  The initial police report found reason to continue with

22  the prosecution.  Miner Declaration paras 22-33, Exhibit 3, Dkt 246-3 (May 22, 2007).

23  Government counsel agreed, and sought to question plaintiff, <u>id</u>, but plaintiff was no longer to be

24  found in Panama.[8]

25  ────────────────

26         [8]  The police desired to question plaintiff Johnson, but he had "disappeared."  "Upon
    performing an analysis of the process, we are of the opinion that we are before a crime

1          Soon afterwards, plaintiff filed for bankruptcy on July 3, 2007 (Case 07-25104-C-

2   7 (E.D. Cal.), and Thomas Aceituno was appointed as bankruptcy trustee for this case.  See

3   generally Aceituno Declaration, Dkt. 252.[9]  The bankruptcy was converted to a Chapter 7, and

4   Aceituno took control as a successor plaintiff of a state lawsuit filed by plaintiff against many of

5   the same or similarly situated defendants herein.  Id. As the plaintiff in the adversary bankruptcy

6   action, Aceituno settled with the state defendants in May of 2008.  An important aspect of the

7   settlement was that all defendants cease their efforts to have plaintiff Johnson criminally

8   prosecuted by the Panamanian authorities.  Id at 2-4; see also Exhibit 1 to Aceituno Declaration.

9          It is not clear from the facts what the defendants herein did to cease their criminal

10  prosecution efforts against plaintiff; however, for whatever reason the worm turned somewhat in

11  favor of plaintiff when the prosecution against plaintiff made its way to Panama's Superior Court

12  of the Third Judicial District.  Dkt 264 commencing on electronic page 12 (English translation).[10]

13  This decision, rendered in May of 2008, dealing with an arrest warrant of sorts, is set forth in

14  pertinent part, as it sets the scene for the provisional dismissals set forth below:

15          This Court of Justice takes cognizance of the precautionary Habeas Corpus
        motion lodged by attorney Ubaldo Vallejos in favor of Shepard Johnson against
16      the First Prosecutor of Bocas del Toro Circuit as it deems unfair the preventive
        detention issued against his client.

17                                          ***

18

---

19  AGAINST THE PATRIMONY (fraud), classified in Chapter IV, Title IV of the Second Book of
    the Penal Code...."  DKT 246-3, electronic page 27.

20

21      [9]  Plaintiff seeks to dispute some of these facts, and others, e.g., whether defendants
    herein paid for their land or possessory rights in full as they declare under penalty of perjury.
    Plaintiff claims to need more time to discover the facts.  However, summary judgment is not to
22  be defeated by postured claims of ignorance when the facts would clearly be known, one way or
    the other, by plaintiff Johnson in review of his own documentation in these matters.

23

24      [10]  The parties to this motion do not favor the court with a description of the Panamanian
    judicial system, but it appears from information which the undersigned deems authoritative, that
    the judicial system is comprised of in descending order: (1) a Supreme Court; (2) Judicial
25  Districts; (3) Judicial Circuits; (4) Judicial Municipalities.  The district in question which
    encompasses the real estate at issue is the Third District, corresponding to the Superior Court
26  which issued the above decision.  Www.oas.org/juridico/mla/en_pan-int-des-system.pdf.

1    In view of the above [recounting of events] in the opinion of the Court the fact in
2    question has not been proven, as the behavior under investigation lacks a criminal
     connottaion (sic) as it has the form of a controversy deriving from contractual
3    breach which should be resolved before the courts of civil justice.

4    On the other hand, this superior court disagrees with the facts stated by the
     prosecutor as, in its opinion, they are the central points that supported the ordering
     of a preventive detention against the claimant Shepard Johnson as it is observed
5    that none of the evidential elements which served as basis to issue the examined
6    order provide evidence to this Court, *at least preliminary*, a deceitful and willful
     misconduct from the accused causing property damage to the victims – as these
7    criminal profiles are provided for to give rise to the crime of swindle.  In this line
     of reasoning, it is worth mentioning that case law states "the crime of swindle
8    involves obtaining though fraud an unlawful benefit provided by the victim who
     acts in reliance on the deceitful means." [citation omitted]

9    Thus, in view of the fact that the punishable act could not be evidenced and no
     sufficient indications of the petitioner's relation to this constitutional act could be
10   gathered – requirements demanded by articles 2126, 2128 and 2140 of the Judicial
     Code, this superior court declares the unlawfulness of the detention order issued
11   by the First Prosecutor of Bocas del Toro Circuit against Shepard Johnson,
     regardless of the possibility to include new elements in the future that allow
12   changing this order.

13   (Emphasis added)

14           Taking their cue from the Superior Court, the prosecutor(s) asked for and received

15   *provisional* dismissals of defendants' initiated criminal prosecution of plaintiff Johnson.  It is

16   interesting to note the difference in language of the various dismissals, but the common provision

17   was a provisional dismissal.  The undersigned sets forth here the language of several dismissals.

18   (Judicial Branch, Second Criminal Court, Judicial Circuit of Bocas Del Toro dated July 29,

19   2009) – [ Kahler])

20   A prior analysis of the evidence incidental to the inquiry helps us realize as stated
     by the Public Prosecutor that there are no sufficient grounds to accredit the
21   existence of a punishable fact considering the project developer is not registered
     with the Public Registry.
22                                            ***
     Consequently [the Court] ...hereby PROVISIONALLY DISMISS these
23   indictments filed against SHEPARD JOHNSON for the alleged CRIME
     AGAINST PROPERTY to the detriment of JULIE ANN KAHLER.....

24

25   Dkt 265 electronic page 1-2.

26   /////

                                           14

1   (Same Court but describing itself as the Second Court of Penal Circuit – decision dated October

2   14, 2009 [defendant Tornga herein])

3       In regards to the above referenced request [prosecutor's request], this Court
        observes that even though legal proceedings have been made to solve (sic) the

4       complained act, it has not been able to show the existence of a link or contract
        between the alleged victim and the possible perpetrator, so the commission of a

5       crime cannot be established... thus the request made by the Public Ministry is
        viable, ordering a provisional dismissal on the current inquiries, according to

6       article 2208, number 1of the Judicial Code, so if new facts that could change this
        ruling are discovered, the reopening of the investigation can be reordered.

7

8   Dkt 265 electronic page 7.

9   (Same Court, decision dated December 30, 2009 [decision relevant to Hermanson case])

10      In view of the above, this court notes that although several judicial diligences
        have been carried out aimed at clarifying the reported event, it has not been

11      possible to prove the existence or introduction of relevant elements.  Therefore, no
        crime could be proven according to article 2046 of the Judicial Code.  In this

12      sense, the request of the Attorney General as to issue a provisional dismissal of
        proceedings ...is deemed feasible since in the event new evidential elements

13      appeared in the future to vary this decision the investigation could be reopened.

14  Dkt 265 electronic page 13.

15  (Same Court, decision dated July 17, 2008 (defendant Chester Mitchell)

16      FIRST: By means of a Fiscal Hearing...the First State Attorney of the Circuit of
        Bocas del Toro requests a Provisional Acquittal.

17      SECOND: After a previous analysis of the documentary evidence close to the
        process, we consider that on the grounds of the existing contract between the

18      parties and its breach, this would be a business of a civil nature, therefore, we do
        not see... that we are facing a criminal conduct....

19      Dkt 264 electronic page 45. [The actual decision of this Court ordered the
        indictments "filed,", but in the context of the decision, it appears that they were

20      dismissed.]

21  All of the dismissals were provisional, that is, they could be refiled if the prosecutor gathered

22  more facts.  However, since the complainants had foresworn further participation in the criminal

23  process pursuant to the bankruptcy settlement, acquisition of further facts was unlikely.

24          The essence of a provisional dismissal above is one made without prejudice to its

25  refiling.  Under California law, a dismissal without prejudice does not, in the absence of

26  contradictory facts, weigh upon, or "go" to, the merits of a lawsuit.  Shoemaker v. Harris, 214

15

1    Cal.App. 4th 1210, --Cal. Rptr. 3d--, 2013 WL 1224709 *5 (2013); In re Marriage of E.U. and

2    J.E., 212 Cal. App. 4th 1377, 1390, 152 Cal. Rptr. 3d (2012) ("'The term 'without prejudice' in

3    its general adaptation means there has been no decision of the controversy on its merits.'");

4    Aleman v. Air Tower Cellular, 209 Cal. App. 4th 556, 586, 146 Cal. Rptr. 3d 849 (2012) (same).

5    In federal practice, the rule is no different.  Oscar v. Alaska Dept. Of Educ. Etc., 541 F.3d 978,

6    981-82 (9th Cir. 2008).

7              Plaintiff cites to Jaffe v.Stone, 18 Cal.2d 146, 114 P.2d 335 (1941), for the

8    proposition that a dismissal of a criminal action after preliminary examination is sufficient to

9    establish the "favorable termination" aspect of a malicious prosecution action (assuming that the

10   presentation of evidence at a preliminary hearing in California is similar to the Panamanian

11   habeas corpus proceeding reflected in the Panama Superior Court decision).  However, such a

12   citation would not reflect the entirety of the court's discussion.  Jaffe stands for the proposition

13   that where a dismissal of a criminal action has been made for want of probable cause, and not

14   some other procedural reason, and the defendant in the criminal action has not thwarted the

15   gathering of evidence,[11] the dismissal of a criminal action at a preliminary hearing can be a

16   favorable termination on the merits to the criminal defendant/malicious prosecution plaintiff

17   even though a new criminal action is not technically barred.[12]

18             The facts are not contrary here to the general notion of a dismissal without

19   prejudice not made on the merits.  Nearly every dismissal was made expressly as a provisional

20   dismissal which permitted the case to go forward upon a refiling.  But more importantly, a

21   primary, if not the primary, reason given by the Superior Court for disallowing Johnson's arrest

22   _____

23        [11] "Similarly, if the accused manages to thwart the efforts of officials by suppression of
     evidence, flight from the jurisdiction, or other acts of this nature, the abandonment of the
     prosecution resulting in the dismissal of the complaint cannot be used by him as a basis of an
24   action for malicious prosecution."  Jaffe, 18 Cal. 2d at 151 (emphasis added).

25        [12] "If, however, the dismissal is on technical grounds, for procedural reasons, or for any
     other reason not inconsistent with his guilt, it does not constitute a favorable termination."  Jaffe,
26   18 Cal. 2d at 150.

1   was that the dispute needed to be resolved in a civil context.  This is the essence of an "other

2   reason" for dismissal not related to the merits.  See fn 12.  Moreover, as previously

3   demonstrated, the prosecution sought to question Johnson, as permitted, if not required, by

4   Panamanian law, but he had left the country and made himself unavailable.  See footnote 8, 11.

5   The statements to the effect that the crime was not "proven," "preliminarily," ostensibly on the

6   grounds that there was not yet sufficient evidence to show malice or intent to deceive, but that

7   there might be in the future, is what would be considered dicta in American courts, but in any

8   event, it was hardly a definitive ruling on the merits in light of the primary reason for dismissal

9   and the circumstances surrounding it.

10          As observed above in Sierra Club Foundation v. Graham, malicious prosecution is

11  not a favored claim in that it tends to chill one's ability to complain to prosecutorial or civil

12  authorities when it appears that a crime or civil tort may have been committed – therefore if there

13  is a *residue of a doubt* about whether the underlying action was resolved on its merits, no

14  malicious prosecution claim can be stated.  See also Sheldon Appel Co.v. Albert & Oiker, 47 Cal

15  3d 863, 872, 254 Cal. Rptr. 336 (1989) ("Although the malicious prosecution tort has ancient

16  roots, courts have long recognized that the tort has the potential to impose an undue 'chilling

17  effect' on the ordinary citizen's willingness to report criminal conduct or to bring a civil dispute

18  to court, and, as a consequence, the tort has traditionally been regarded as a disfavored cause of

19  action.").  Indeed, the law encourages report of a crime to the point where it is itself a felony to

20  have knowledge of the actual commission of a felony and not report same to the proper officials.

21  See e.g., 18 U.S.C. § 4.  This not to say that a malicious prosecution claim should not be honored

22  when it is viable, Crowley v. Katleman, 8 Cal. 4th 666, 680, 34 Cal. Rptr. 2d 386 (1994),

23  recognizing such but still "adhering" to the constraints of Sheldon; it is to say that the constraints

24  to a malicious prosecution action exist and must be thoroughly scrutinized.  See Wilson v.Parker,

25  Covert & Chidester, 28 Cal. 4th 811, 817-818, 123 Cal. Rptr. 2d 19 (2002).

26  \\\\\

1    In light of the above standards under the governing law, and for the reasons

2  expressed in this section, the undersigned finds as a matter of law that the underlying

3  Panamanian criminal prosecutions were not finally determined favorably to plaintiff *on their*

4  *merits*, and this alone warrants the grant of summary judgment to defendants on their motion.

5    V. <u>Whether The Defendants Had Probable Cause To Complain Against Plaintiff</u>

6    <u>to Panamanian CriminalAuthorities Is Unable To Be Determined On Summary</u>

7    <u>Judgment</u>

8    Just as the issue of whether an underlying action was terminated on its merits

9  favorable to a plaintiff in a malicious prosecution action is decided as a matter of law, so too is

10 the issue of whether the malicious prosecution defendants possessed probable cause to initiate

11 the underlying proceedings.  Such was the holding of the seminal <u>Sheldon Appel</u> case.  47 Cal.

12 3d at 876-881.  Thus, the undersigned must assess the facts presented by the parties in an

13 objective manner, <u>id.</u>, and determine whether the acts of the present defendants were reasonable.

14 The existence of opposing subsidiary facts, at the very least, opposing inferences from historical

15 facts, does not preclude the court from so finding.

16    The objective nature of the court's inquiry is much like that the undersigned

17 would encounter in determining to issue a search or arrest warrant on probable cause.  That, is,

18 from a common sense standpoint, did sufficient facts exist that a neutral magistrate would find a

19 fair probability that the material facts point to a crime having been committed.  <u>United States v.</u>

20 <u>Gourde</u>, 440 F.3d 1065, 1071 (9th Cir. 2006) (en banc), citing <u>Illinois v. Gates</u>, 462 U.S. 213,

21 103 S. Ct. 2317 (1983).  Also, it must be kept in mind that defendants herein had no power to

22 arrest plaintiff or actually commence criminal proceedings.  All that defendants possessed was

23 the ability to "complain" to prosecutorial authorities who would then conduct their own

24 investigation and make a determination themselves whether to open a formal criminal

25 investigation, file charges, or arrest plaintiff.  Thus, the crucial inquiry is whether defendants

26 herein had probable cause to *complain* to prosecution authorities who then might, or might not,

commence proceedings.

One final threshold issue remains.  Assuming California law supplies the rule of decision for the malicious prosecution claim, nevertheless, the crime to which probable cause is directed remains the Panamanian equivalent of criminal fraud.  That is the crime which defendants thought plaintiff Johnson committed, and that is the crime for which they complained to Panamanian authorities.  If defendants complained to Panamanian authorities without probable cause, it makes no sense not to examine the crime about which defendants complained.  Yet, defendants never attempt to define the elements of criminal fraud or any crime, much less the Panamanian version.[13]

However, the undersigned need not attempt his own definition for Panamanian criminal fraud in that plaintiff's expert in Panamanian law supplied such a definition.  This uncontested definition will be accepted.

6.  "Estafa" or fraud [alternatively denominated as a crime against the "patrimony"] is currently regulated by the Criminal Code of the Republic of Panama.....

7.  Its articles appear in Book II, Chapter III, entitled "Estafa y otros fraudes", in Articles 220-226.  The basic or simple type of "estafa" is regulated under Article 220.

8.  I have attached as an exhibit a true copy of Article 220 of the Criminal Code of the Republic of Panama, refer to Exhibit 1, and a certified English translation, refer to Exhibit 2.

9. Article 220 of the Criminal Code, states (our translation):
*Article 220. He who by deception procures for a third party an illicit gain to the detriment of another shall be punished by imprisonment of one to four years.  The penalty is increased to one third when committed by abusing personal or professional relationships, or when carried out through cybernetic or computer medium.*

---

[13]  Plaintiff Johnson does not dispute herein that he *could be* liable for fraud even though defendants signed their contracts with corporations created by plaintiff.  Whether a corporation or individual acting on behalf of the corporation can be liable may be a complicated analysis.  However, in the absence of any dispute, the undersigned will assume what all parties have assumed – that plaintiff Johnson can be criminally liable for what transpired, or did not transpire, in Panama.  Moreover, plaintiff has never claimed that he was not authorized to act on behalf of his corporation.

10. The elements that must be proved with respect to the "estafa" provision as described in Article 216 of the Criminal Code of the Republic of Panama are: (1) that there was a deceit, which presupposes that there was fraudulent conduct; (2) that there was an illicit gain in favor of oneself or a third party; (3) that the deceived party suffers economic damage.

11. I note that there is no legal definition of deceit in our Criminal Code. I further note that in order for the conduct to be considered a crime, it must also be proven that the person who allegedly committed the crime, in this case, "estafa" acted with "dolo",which can be translated as lie, trick or malice, which is defined in Article 27of the Criminal Code as follows (our translation):

*Article 27. A person acts with "dolo" [malice] when he wants the result of the fact legally described, and he who accepts it in the case of it being represented as possible.*

Patel Declaration, Dkt 265, Exhibit 1 at 2-3.

Although the English is somewhat lost in the translation, at least to the undersigned's ears, the undersigned understands it to mean that one will be guilty of fraud under Panamanian law when one accepts a benefit and promises in return an occurrence or event knowing full well at the time, or later, that he does not intend to perform what is promised even though performance is possible.

Plaintiff posits a myriad of disputed subsidiary facts, e.g., which party was at fault for the failure of the pre-criminal complaint resolution, whether corrupt Panamanian officials and/or environment concerns blocked plaintiff's effort to honor his contracts with defendants, whether the initial contracts contemplated CC&Rs and to what degree, however, the historical facts which are material to the court's decision are more undisputed, but still far from clear.

Pared to its essence defendants posit three main reasons why they sought Panamanian legal advice and then complained to Panamanian criminal law enforcement authorities: (1) titles were never conveyed; (2) infrastructure was not completed, or even substantially performed; (3) monies earmarked for the infrastructure, some of which were to be derived from the purchase price of lots, had vaporized.

/////

/////

1            *Conveyance of Title*

2            First, it is undisputed that all moving defendants paid for their property rights,

3   either fee title or possessory (ROP) rights.  It is further undisputed that most of the initial contracts

4   under which the payments were made provided that upon payment in full, the appropriate title was

5   to be conveyed to the defendants.  See defendants' Points and Authorities, Dkt 245-1 at 14,

6   recounting the declarations of all defendants that payment was made in full.  See e.g., Miner Dec.,

7   Dkt. 246-1 (Contract for Purchase): " Ninth: It is understood between the two contracting parties

8   that the Rights or Title to the property will be given to THE BUYER when all monies and accrued

9   interest have been paid in full according to the second paragraph above."[14]  However, what

10  defendant Miner was purchasing was made unclear when he agreed that he, as BUYER,

11  "accept[ed]the ownership of Usufructo Rights (Possession Rights) and or title to the following

12  property described as follows...."  Dkt 262-1 electronic page 2.  Which was it – fee title or

13  possession rights?  There is no dispute that appropriate fee titles were never conveyed for those

14  who purported to purchase "fee" land.  But what was an appropriate title document under

15  Panamanian law is never made clear, especially in that the entire project could remain as "one

16  unit."  See attachment to Miner purchase contract, Dkt 262-1 electronic page 4:

17       "The Isla Solarte project is a community designed with a homeowner association
         to operate as one homogeneous entity. [new para.] Grupo Isla Tropicales is in the
18       process of applying for a rural Subdivision.  When and if the subdivision is
         completed, each owner will receive a separate title for each parcel. There is the
19       possibility that the requirements for the subdivision conflict with the security and
         design of the master planned community.  If this occurs, Isla Solarte will operate as
20       one entity without the subdivision."[15]

21  In other words, the parties ostensibly agreed that no separate title might ever be conveyed because

22  no subdivision might ever take place.  When analyzing these contractual provisions on their own,

23  mutual mistake comes to mind, but not necessarily the commission of a fraud.

24  _____

25       [14]  Plaintiff's apparent claim that he had a right to later unilaterally modify this paragraph
    is pure sophistry.

26       [15]  With apology to Shakespeare, this paragraph is filled with [words]  signifying nothing.

1      The matter of "possessory rights" title is more muddled since the contract itself

2 purported to convey the possessory rights.  See e.g., Tornga Dec, Dkt 249 at 2 and 249-1, para.

3 "First."  Also, a document explaining the purchase of possession rights, ostensibly made available

4 with the purchase contract makes it unclear that any "title" documents as we know them in

5 California or the United States would ever be transferred:

6         Grupo Cayo Nancy is a development unit within the Isla Solarte project....

7         The property of Grupo Cayo Nancy is owned by Grupo Cayo Nancy S.A., a
        Panamanina corporation, formed for the sole purpose of owning the Possession
8       Rights of the subject property.  This property has been physically inspected by the
        Reforma Agraria and it ownership has been approved by and registered with the
9       Reforma Agraria agency.  The law requires that Possession Rights property, from
        here on referred to as Rights Property, be owned by a Panamanian entity...
10
        When ownership of the land right is transferred from Grupo Cayo Nancy S.A. to
11      the new owner, the owner will be provided with a map, a contract formalyzing the
        purchase of the rights, a specific class of stock in Grupo Cayo Nancy S.A. for the
12      land area purchased.  The property will be physically staked and the ownership will
        be registered with the Grupo Cayo Nancy S.A. Corporate Minutes.
13

14 Attachment to the Mitchell purchase of ROP property, Dkt. 263, electronic page 17.[16]

15      However, the Tornga declaration goes on to provide that the appropriate

16 documentation of her possessory right was never sent to her despite promises by plaintiff that it

17 would be.  Rather, some years after the initial contract was signed, Tornga was given or offered

18 non-voting or very diluted shares in the corporation which had initially promised to convey

19 possessory rights, and these shares were evidently in lieu of another ownership documentation.

20      Defendant Wand concedes that it is unclear what type of property rights she was

21 purchasing in July 1998.  Defendants' Points And Authorities at 3 (Dkt 245-1).

22

23      [16] Since the operative purchase agreement had already conveyed the possession rights, it
is unclear what further "contract" was necessary.  The issuance of undefined (and non-voting or
24 diluted) shares in an entity which purports to own land is hardly the conveyance of any real estate
rights. The Mitchell purchase agreement contract, however, unlike the Tornga contract, also
25 stated that: "Ninth: It is understood between the two contracting parties that the Rights or Title to
the property will be given to THE BUYER when all monies and accrued interest have been paid
26 in full according to the second paragraph above. Dkt. 263, electronic page 16.

1    The historical facts are far from clear, and the undersigned will not recommend

2 summary judgment on probable cause when the historical facts require further development.

3 *Infrastructure*

4    It is undisputed that plaintiff Johnson owed a duty to provide some infrastructure.

5 It is also undisputed that the infrastructure to be performed was not finished.  What remains

6 unclear is the type of infrastructure to be provided and the degree to which any of it was finished

7 such that the failure to complete infrastructure would give rise to an inference of "estafa."

8    The only documentation of the infrastructure to be provided by plaintiff Johnson

9 appears in attachments to contractual purchase agreements, e.g., Dkt 263, electronic page 19

10 (Mitchell documents):

11    Developer responsibilities:
     The developer retains the offshore water rights for future development.
12    a) provide access
     b) Stake lot corners
13    c) Clear the land for access including beach area
     d) Construct a dock
14    e) Coordinate power to Solarte
     f) Marina slips or mooring buoys for rent

15

16 See also e.g. Dkt 246-1 electronic page 6.

17 Defendants rely on verbal descriptions of advertising material issued by Johnson promising cart

18 paths, electricity to each lot, internet, telephone and cable.  Miner declares that in August 2004,

19 Johnson admitted that the infrastructure account had a negative balance despite having collected

20 approximately $4,000,000 from lot sales.  Miner Dec., Dkt 246 at para 15.  Also set forth is

21 Johnson's testimony at a creditors meeting, August 10, 2007 in which Johnson did admit that the

22 infrastructure was not complete but that it had started.  Dkt 247-1.  Johnson also conceded that

23 $2,000,000 to $3,000,000 would be needed to complete the infrastructure.

24    Mr. Steeg: One of the obligations that you had was to finish–is finish the
     infrastructure on the project.  Is that correct?
25    Mr. Johnson: Yeah, GIT [one of the corporations]
                              ***
26    Mr. Steeg: Everyone was told that this was going to be started and completed long,

23

long, ago–
Mr. Johnson: Correct.
Mr. Steeg:– and that hasn't happened.
Mr. Johnson: Well, it's started.
Mr. Steeg: Is that correct?
Mr. Johnson: It hasn't been completed.
Mr. Steeg: Very, very little bit of it has been completed.  Is that correct?  There's
an ongoing obligation of an estimate of, what, $2-3 million?  Is that– would that be
accurate as to complete this infrastructure?
Mr. Johnson: Yes.[17]

Plaintiff has introduced as exhibits pictures of infrastructure completed or in

progress showing docks, roads culverts and the like.  The precise time the pictures were taken is

not set forth on most of the exhibits.  What dates do exist appear to be years after the purchase

agreements at issue herein – many in 2006.  Dkt 261-1, Dkt 262.  Infrastructure pictured after the

criminal complaints were made (2007) would not be relevant to the probable cause analysis.

Moreover, defendants herein have not detailed what part of the incomplete

infrastructure inhibited or precluded the use of their lot in terms of demonstrating a specific

promise made with the non-performance of the promise.

Finally, not completing the infrastructure or not having the funds to finish it, in and

of itself, would not be a criminal act.  The lack of infrastructure must be accompanied by an

illegal act, i.e., the siphoning off of funds by plaintiff which had been promised to be spent on

infrastructure.

### The "Disappearing" Infrastructure Funds

As set forth in the previous section, it is undisputed that the infrastructure was not

completed.  It is also undisputed that as of 2007, no money remained to complete the

infrastructure.  Defendants assert that plaintiff did not use the money from lot sales, or did not use

sufficient money, to complete the infrastructure, and that the money to complete it is "missing."

---

[17]  Plaintiff objects to this exhibit in that the entire transcript was not produced to him.
However, because this involves plaintiff's testimony, and any inaccuracies or supplement could
be easily adduced by him, the undersigned overrules the objection.

This is true.  What defendants do not show is any contemporaneous documentation demonstrating

an agreement that monies for infrastructure *were obligated to be* derived from lot sales or some

other specific source controlled by plaintiff, and in what amount.  It is difficult to show that

monies were fraudulently siphoned from an earmarked account when there is no dedicated fund or

base line from which to measure.

                Testimony from plaintiff at the creditor's hearing is again illuminating.

> Mr. Jacoby: No.  You received 4.5 million in sales, that's according to your own testimony.
> Mr. Johnson: That's correct.
> Mr. Jacoby: Your –your papers represent that GIT owes you $1.5 million-
> Mr. Johnson: That's correct.
> Mr. Jacoby: –undermining (sic) those two sums for a $6 million sum.
> Mr. Johnson: Right.
> Mr. Jacoby: And my question is, where was that $6 million invested?
> Mr. Johnson: Okay.  The $6 million, and I think ultimately your question is where was it spent, where did it go?
> Mr. Jacoby: That is.
> Mr. Johnson: Okay.  The $6 million– the main categories of $6 million were– would be for Panama payroll, architectural engineering, legal, sales commissions and that's– and maybe land acquisitions.  But– some.  Land acquisitions is small. So that's– as I said, it's a full accounting.  I –I– I'm not...what I've learned from my attorneys is this.  I have every right to spend the money I receive any way I want.  But in the spirit of putting this issue, 'cause it's a hot one, I think there should be a full accounting and with– in some confidential way where your accountant can look for my accountant and they can reach an agreement...
> Mr. Jacoby: –let me ask one more follow up question if I may.  Of that $6 million, how much do you believe has been invested in actual capital improvements on Isla Solarte as part of the project?
> Mr. Johnson I think– I would say in the two hundred to five hundred thousand to a million.
>                      ***
> Mr. Ginter:  Yes. Prior to 2002, how did you intend to pay for the capital improvements on Isla Solarte?
> Mr. Johnson: Through lot sales.
> Mr. Ginter: Okay.  Did you have a budget pursuant to which you were sequestering a portion of each lot sale proceed to pay for– to create the money to pay for that?
> Mr. Johnson: Not a formal budget, no.

Creditor's Meeting Testimony, Dkt 247-1, 157-159.

        This is not to say that defendants will not ultimately be able to prove the historical

facts necessary to demonstrate a "dolo."  The totality of facts at trial (including credibility

determinations) could well demonstrate the specific infrastructure promised, that plaintiff knew

that he did not have enough money to complete the infrastructure necessary for these defendants, kept the defendants at bay with rosy reports about what was transpiring, kept on diverting excessive money from new lot sales to fund his own personal endeavors, and therefore knew that a default of his obligations was just a matter of time.  The later developed facts could demonstrate that Johnson never had any intent to complete the infrastructure when he accepted money from these defendants.  At best (for plaintiff) and as presently analyzed, plaintiff Johnson was in a development project in a foreign country – in way over his head in terms of expertise and contacts to successfully complete it, or at worst, he was attempting to unload properties which he had earlier purchased, and never intended to construct a usable development.  The facts produced by defendants thus far have the smell of deceit, but more is needed before summary judgement could be entered on this issue.

In addition, the undersigned is impressed that defendants herein sought the advice of Panamanian counsel before making their criminal complaints.  Clearly, they were advised to go forward with the "denuncios" based on the facts which they possessed.  However, these facts go more towards showing that defendants did not initiate any prosecution against plaintiff with malice (a factual question in a malicious prosecution action) than they show probable cause to believe that plaintiff intended a fraud.

In sum, the undersigned could not issue a probable cause search or arrest warrant based on the present facts.  Although it is not necessary that all facts be "proven" at this juncture, given that probable cause is a question for the court, much like the Panamanian courts, the undersigned must await further factual development, if that is necessary at all given judgment on the favorable termination issue.  And again, like the Panamanian courts, the undersigned has not ruled in plaintiff's favor on the merits; plaintiff should take no comfort from having survived summary judgment on this probable cause issue.

Summary judgment cannot be issued to defendants on the probable cause issue.

\\\\\

VI.   The Conspiracy Claim Fails

Because the underlying malicious prosecution claims fail on the "favorable termination" issue, the conspiracy claim premised on the same alleged malicious prosecution fails as a matter of law.   Avalos v. Baca, 596 F.3d 583, 592 (9th Cir. 2010).

*Conclusion*

Although summary judgment is not recommended on the probable cause issue, the court has found as a matter of law that the Panamanian criminal investigation/prosecution was not terminated on its merits in favor of plaintiff such that plaintiff may continue with his malicious prosecution action.  Indeed, if plaintiff were to take a step back and look at his actions herein with some perspective, he would find that it would be inequitable to continue his life-sapping litigation crusade against these defendants given the fact that the Isla Solarte resort never came to fruition after years of "development."

Accordingly, the undersigned recommends that judgment be awarded to defendants, (dkt. no. 245), and that plaintiff's counter-motion for summary judgment (essentially an opposition to defendants' motions), (dkt. no. 258), be denied.  This recommendation, if adopted, resolves the entire case, and it should be closed.  The defendants for whom judgment should be entered if these Findings and Recommendations are adopted are:

David and Sarah Miner
Chester and Catherine Mitchell
Sondra Tornga
Anne-Michelle Wand
Viki Kiman
Todd Johnson
Efim and Elena Shargorodsky
Peter Reinhold
Julie Ann Kahler
James Lynch

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written

27

1  objections with the court and serve a copy on all parties.  Such a document should be captioned

2  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

3  shall be served and filed within seven days after service of the objections.  The parties are

4  advised that failure to file objections within the specified time may waive the right to appeal the

5  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6  Dated:  May 14, 2013

7
/s/ Gregory G. Hollows<br>UNITED STATES MAGISTRATE JUDGE
8

9

10  johnson1968.SJ2

28